MORTON Z. OLKEN AND ESTHER OLKEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Olken v. Commissioner
Docket No. 5161-83.
United States Tax Court
T.C. Memo 1987-589; 1987 Tax Ct. Memo LEXIS 588; 54 T.C.M. (CCH) 1172; T.C.M. (RIA) 87589; November 30, 1987; As amended December 2, 1987 Morton Z. Olken, pro se. Dennis Perez, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: This case was assigned to Special Trial Judge Helen A. Buckley pursuant to section 7456(d) of the Code (redesignated sec. 7443A(b) by sec. 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rules 180, 181 and 183. [1] The Court agrees with and adopts her findings of fact and opinion which are set forth below. *591 OPINION OF THE SPECIAL TRIAL JUDGE BUCKLEY, Special Trial Judge: By notice of deficiency mailed December 10, 1982, respondent determined deficiencies in and additions to Federal income tax against petitioners as follows: Additions to Tax
Tax Year
Deficiency
Sec. 6653(b)
1973
$  41,339
$  20,670
1974
469,714
234,856
1976
3,308
2,035
1977
39,899
20,806
Respondent also mailed on December 10, 1982, separate notices of deficiency to each petitioner for the 1975 tax year in which he determined deficiencies in and additions to each petitioner's Federal income tax as follows: Additions to Tax
Petitioner
Deficiency
Secs. 6653(b)
6654
Morton Z. Olken
$ 108,182
$ 54,091
$ 4,671
Esther Olken
107,068
53,534
4,623
Respondent's deficiency notices are based upon his determinations that petitioners received unreported income as follows: [2]
Determined
Source of
Income
1973
1974
1975
1976
1977
Commissions
$ 97,020
$ 134,720
-0-
-0-
-0-
Salary
-0-
-0-
-0-
$ 18,000
$ 18,000
Embezzlement
-0-
549,261
$  71,250
3,829
68,853
Net Rental
Income
-0-
190,081
209,839
-0-
-0-
Partnership
Income
-0-
9,965
47,199
-0-
-0-
Net Long-
Term Capital
Gain
-0-
-0-
119,248
-0-
-0-
*592 In addition to that which he determined in his notices of deficiency, respondent, by way of a second amendment to his answer asserted an increased deficiency in tax for 1973 of $ 2,942.50 together with a corresponding increase in the section 6653(b) addition. This is based upon respondent's assertion that petitioners received an additional unreported commission of $ 11.700 in 1973. In the same amendment to his answer respondent also recharacterized $ 1,660.77 of the asserted unreported wage income in 1977 as additional unreported embezzlement income for the same year. [3]
The issues for decision are as follows: (1) Whether petitioners received unreported income in the taxable years in issue and, if so, the amounts of such income; (2) Whether petitioners are liable for the addition to tax under section 6654(a) for failure to pay estimated tax for the 1975 taxable year; *593 (3) Whether petitioners are liable for the addition to tax under section 6653(b) for fraud for any or all of the taxable years in issue; (4) Whether the statute of limitations operates to bar assessment and collection of any deficiencies in and additions to tax for any of the taxable years in issue; (5) Whether petitioners are entitled to carry back a loss resulting in a tax year subsequent to those in issue, when that loss is the result of restitution of embezzled funds; [4] and (6) Whether the innocent spouse provisions of section 6013(e) are applicable to petitioner Esther Olken for any or all liability for deficiencies in and/or additions to tax. Procedural Background
For the years in issue, petitioners filed Federal income tax returns as follows: Tax Year
Date Return Filed
1973
June 10, 1977
1974 [5]
September 19, 1975
1975 [6]
No Return Filed
1976
July 18, 1977
1977
June 12, 1978
*594 The parties executed Consents to Extend the Time to Assess Tax as follows: Date Consent Form
Assessment Time
Tax Year
Executed
Extended To
1973
May 28, 1981
December 31, 1982
1974
May 28, 1981
December 31, 1982
1975
No Consent Form
Executed
-0-
1976
June 6, 1980
December 31, 1981
1976 [7]
April 3, 1981
December 31, 1982
1977
April 3, 1981
December 31, 1982
As stated, the notices of deficiency were mailed to petitioners on December 10, 1982. Petitioners timely filed their petition for redetermination with this Court. At the time they filed their petition, petitioners resided at Sherman Oaks, California. Shortly after trial in this matter commenced, petitioners, who were represented by Morton Olken, [8] orally moved for leave to file an amendment to their petition. The motion was granted and the amendment was filed raising a new issue. *595 At the close of trial the Court ordered that simultaneous opening briefs be filed. Petitioners did not file an opening brief, despite the fact that they were granted extensions of time to do so. We allowed petitioners to file a brief in reply to respondent's brief because of their unrepresented status. [9] Respondent timely filed his reply thereto. FINDINGS OF FACT There have been extensive stipulations of facts (both written and oral) and these facts are so found. The stipulations of facts [10] and exhibits attached thereto are incorporated herein by this reference. Most of the activities of concern *596 in this matter are those of petitioner Morton Z. Olken. Henceforth, reference to petitioner in the singular will be to petitioner Morton Z. Olken.
Petitioner's Background
Petitioner attended various colleges and universities. He attended Roosevelt University for two years where he majored in Business Administration. He also spent three years at the University of Illinois, where he majored in Architectural Engineering. At about the time of trial he was attending classes in accounting at the University of California at Los Angeles, Extension Division. In 1947, petitioner was licensed by the State of Illinois as a real estate broker and his license appears to have been effective through the time of trial. During the late 1950's through 1960, petitioner was a Junior Real Estate Appraiser and also attended and completed Casualty Property Underwriters School. During the early 1960's, petitioner served as a member of loan committees for several banks. Sometime after this, but prior to 1973, petitioner worked in the insurance business with his father administering a large casualty insurance business in which he dealt with many large corporations. Although not entirely clear, *597 the record seems to indicate that during the entire aforementioned time period, petitioner resided in or around Chicago, Illinois. One thing that is clear from the record is that petitioner has much experience and is sophisticated in matters pertaining to real estate, real estate financing and various aspects of the insurance business. Sometime prior to the summer of 1973, petitioners relocated to southern California. It is not clear what petitioner's occupation was when he first relocated, but apparently he was involved in some aspect of the real estate business. The facts in this matter cover a significant time frame and generate from numerous activities in which petition engaged. For the sake of simplicity, we have outlined the discussion of the facts according to the type and source of income involved. I. Commission Income
A. 16200 Ventura Boulevard Building Transaction
During the summer of 1973, petitioner began negotiations for the purchase of an office building in Encino, California, known as the 16200 Ventura Boulevard Building (hereinafter "the 16200 Building"), which was owned by Dr. and Mrs. Seymour Matanky (hereinafter the Matankys). Since the *598 16200 Building was not profitable at that time the Matankys were quite interested in selling it. The parties negotiated throughout the summer. During the negotiations petitioner represented to the Matankys that he was a licensed real estate broker in Illinois and had a reciprocal license in California. This was not true. Petitioner acted as the broker for the sale, represented both himself and the Matankys, and structured the entire transaction. The building was purchased for $ 1,214,007, net of a $ 49,500 commission transaction. Petitioner received a commission on this transaction of $ 49,500 in 1973 which amount was used as a credit by him in the purchase of the building. It was, in effect, his down payment. Petitioner contends that he did not purchase the building for his own account, that the actual buyer of the 16200 Building was a fictitious Illinois corporation formed and entirely controlled by petitioners named Great Northern Industries (hereinafter "GNI-Ill."). [11] Petitioner claims that he acted as the broker in the transaction representing the buyer GNI-Ill. but Mrs. Matanky, a very credible witness, testified that petitioner made no representations that he was *599 representing any corporation and that she and her husband were operating under the assumption that the Olkens were purchasing the 16200 Building as individuals. At no time did petitioner hold himself out as a representative of a corporation. Petitioners were the purchasers of the building in their individual capacity. The record does not indicate that GNI-Ill. was in existence in 1973. As a result of the negotiations, the Matankys became very impressed with petitioner's knowledge of real estate [12] and his creativity in structuring financing for the transaction. They were most impressed by petitioner's ability to consummate the purchase of the 16200 Building without providing any cash for the down payment. The broker's commission payable to petitioner was $ 49,500, and he instructed the escrow company to credit this amount to his account for the down payment. *600 On October 10, 1973, the escrow for this transaction was closed. On that date a Grant Deed, which had been executed by the Matankys on September 26, 1973, was recorded. The Grant Deed indicated GNI-Ill. as the grantee, although the property had been sold to petitioners as individuals. Petitioner prepared most of the documents in regard to the sale and presented them to the Matankys for their signatures, which they provided fairly routinely as they trusted him. Although the deed listed GNI-Ill. as the grantee in the transaction, we find that the 16200 Building was sold to petitioners as individuals. Petitioner took possession and control of the building and operated it in his individual capacity. There was no corporation GNI-Ill. in existence. Petitioner earned $ 49,500 as a real estate commission on this transaction. B. Ranch Transactions
The Matankys were impressed by petitioner's business acumen and apparent honesty and they early developed great faith in his integrity. Petitioner suggested that the Matankys invest in the farming business. Petitioner told the Matankys that he had knowledge of farming and that he had studied farm engineering. This was not true. *601 Neither of the Matankys had any knowledge of farming. Nevertheless, toward the end of 1973 they agreed to enter the farming business. At that time they entered into an oral agreement whereby petitioner would locate, acquire and manage potentially profitable ranches and the Matankys would purchase them. The arrangement was that petitioner's broker's fees were to be credited to the purchase price. Then, once the Matankys recouped their initial investment, petitioners were to be entitled to a 50 percent ownership interest in the ranches and the remaining 50 percent interest would be retained by the Matankys. Petitioner was not to receive any compensation for managing the ranches until the Matankys recouped their investment. Their oral understanding was that there would be a partnership in which petitioners and the Matankys would be equal partners. In practice, however, petitioner received some of the commissions in the form of unsecured promissory notes from the Matankys, and one commission in cash. Pursuant to this agreement, between December 1973 and February 1974, the Matankys purchased four ranches. Petitioner undertook the management of each of the ranches under the name *602 of Southwest Enterprises. The facts surrounding the acquisition of each ranch will be discussed separately; however, there are some facts common to the acquisition of all four ranches. These are: 1. Petitioner represented the Matankys as their real estate broker; 2. As broker petitioner negotiated the terms of the acquisition of each ranch, transferred funds into escrow and handled all of the paperwork; 3. Petitioner maintained the records of each acquisition and supplied copies to the Matankys; 4. Petitioner managed each ranch acquired; 5. The understanding between petitioner and the Matankys concerning profits and ownership sharing was consistent with their oral agreement; and 6. Petitioner was not to receive a broker's fee or compensation for managing the ranches until the Matankys recouped their capital. Almondoz Ranch
On or about December 11, 1973, the Matankys purchased the Almondoz Ranch for $ 390,000. Petitioner received an unsecured promissory note from the Matankys in the amount of $ 11,700 with interest at 8 percent per annum as a broker's commission from this transaction. [13] This note was dated December 11, 1973, and due on February 15, 1974. *603 Its value was $ 11,700. Kelly Ranch
On or about December 26, 1973, the Matankys purchased the Kelly Ranch [14] for $ 1,619,000. The escrow instructions originally indicated that petitioner was to receive an unsecured promissory note of $ 47,520 as a commission. Subsequently, petitioner's name was crossed out and Great Northern Industries was replaced as the recipient of the note. Petitioner altered the escrow document and placed Great Northern Industries on it as recipient of the note. It was common practice for petitioner to alter documents. [15] The note was executed on December 26, 1973, for $ 47,520 at 8 percent interest per annum payable to either petitioner or Great Northern Industries [16] and was due on July 1, 1974. Its value was $ 47,520. It was consideration for petitioner's services as a broker and was received by him in 1973. Petitioner represented to the Matankys that they would recoup their investment in the Kelly Ranch within nine months to a year, the length of time it would take to have three to four harvests of alfalfa, which *604 was the principal crop grown on the Kelly Ranch. This did not happen. Wright Ranch
In January of 1974, the Matankys purchased for $ 700,000 the Wright Ranch which was located in Imperial County, California. On this transaction petitioner received a $ 21,000 cash commission in 1974 even though he was not supposed to receive any commissions according to his understanding with the Matankys. Tullos Ranch
On or about February 25, 1974, the Matankys *605 purchased the Tullos Ranch for $ 550,000. Petitioner received an unsecured promissory note at 8 percent interest dated February 25, 1974, and due May 1, 1974, payable to Morton Z. Olken as commission from this transaction for $ 16,500. [17] The value of this note was $ 16,500. C. Encino Medical Towers Transaction
In 1974 the Matankys and petitioners entered into an agreement to form the M & O Enterprises partnership (hereinafter "M & O"). This partnership was formed to acquire and develop a medical office building known as the Encino Medical Towers, which was located just down the street from the 16200 Building. On June 1, 1974, the Matankys and the Olkens executed the partnership agreement, which provided for an arrangement almost identical to that governing the acquisition and development of the ranch properties. The Matankys were to purchase the Encino Medical Towers and petitioner was to manage the property. Although petitioner acted as the broker on behalf of the Matankys in acquiring the property, he was not to be compensated for assuming this role. The Encino *606 Medical Towers was purchased through the United States Bankruptcy Court. Originally title was passed to Great Northern Industries, Inc., a California corporation (hereinafter GNI-Cal.) and on August 26, 1974, GNI-Cal., by way of a quitclaim deed, transferred title to M & O. GNI-Cal. acted solely as a conduit for funds transferred by the Matankys to the Bankruptcy Court for the purchase of the property. Regardless of the title holder, however, it is clear that commissions received on the sale were for the services of petitioner. He received a $ 30,000 commission in cash from this transaction in 1974. II. Embezzlement Income for 1974 and 1975
A. Southwest Enterprises
On June 20, 1974, the Matankys and the Olkens executed the Southwest Enterprises partnership agreement. In essence, the agreement memorialized in writing the oral agreement under which petitioner and the Matankys were operating in regard to their farming ventures. In addition to the provisions dealing with the acquisition of the properties and the sharing of ownership and profits after the Matankys recovered their investment, the agreement provided in relevant part as follows: 1. The Matankys were *607 entitled to a 100 percent allocation of net profits and losses from Southwest Enterprises until such time that they received distributions from the partnership equal to their aggregate capital contributions; 2. The partnership would have its place of business at the 16200 Building; 3. No portion of the partnership capital could be withdrawn without the unanimous written consent of all partners; 4. No partner was entitled to any salary or compensation for services to the partnership; 5. Each partner was to have an equal voice in the management of the partnership and have authority to bind the partnership in making contracts and incurring certain obligations in the name and on the credit of the firm. However, no partner was to incur any obligation in the name or on the credit of the partnership exceeding $ 5,000 without the express written consent of the other partners. Any obligation incurred in violation of this provision was to be charged to and collected from the individual partner incurring such obligation. This limitation on obligations was subject to change by agreement of the partners; 6. Obligations of the partnership paid out of personal funds were subject *608 to reimbursement; and 7. No partner might draw funds for personal use without the written consent of the other partners. The Matankys contributed 100 percent of the capital contributions to Southwest Enterprises. Their contributions took two basic forms: first, they contributed their interest in the ranches which they had acquired as individuals and second, they contributed substantial amounts of cash to the partnership purportedly for operating expenses. The cash was generally turned over at the suggestion of petitioner who told the Matankys that the partnership needed the sum he requested to cover partnership expenses. Since the Matankys trusted petitioner implicitly, they never questioned the propriety of any request for funds by him. If cash was requested by petitioner, either Dr. or Mrs. Matanky wrote out a check. In certain cases (which will be detailed more specifically, infra), the checks were not issued to Southwest Enterprises but to other entities or individuals. During 1974, petitioner undertook the management of the Almondoz, Kelly, Wright and Tullos ranches on behalf of Southwest Enterprises. The ranches were principally engaged in the cultivation of *609 hay, alfalfa, cotton and wheat. Some of the ranch land was leased to an independent sheepherder for grazing of his flock. The ranches were not in the business of owning or raising any type of farm or ranch animals. During 1974 and 1975, petitioner maintained Southwest Enterprises' checking accounts at the following banks: Wells Fargo Bank in Encino, California, Bank of America in Van Nuys, California, and Manufacturers Bank in Encino, California. Petitioner had signatory authority over all of the accounts and was entirely responsible for overseeing deposits and disbursements of funds into and from the accounts. As the manager of the ranches and the partnership petitioner had complete, unrestricted control over partnership assets. In theory, of course, petitioner was limited by the terms of the partnership agreement, but in reality, because the Matankys trusted petitioner and did not question his actions, petitioner had complete autonomy concerning the operation of the partnership and its assets. The Matankys rarely, if ever, involved themselves with the operation of the partnership. Petitioner did, however, have some help in managing Southwest Enterprises. On April 3, 1974, petitioner *610 hired Sally Schoonover to work as a secretary/bookkeeper for the partnership. [18] Ms. Schoonover performed various functions, such as handling payroll, accounts receivable, and correspondence; maintaining a journal; reconciling bank accounts; depositing and disbursing funds into and from business bank accounts and petitioner's personal bank accounts; [19] and answering the telephone. In virtually every phase of his activities involving Southwest Enterprises petitioner was assisted by Ms. Schoonover. Eventually, she became a confidante of petitioner's. Through her own personal observation and through what petitioner had told her, she became aware that petitioner was embezzling funds from Southwest Enterprises, inter alia. She eventually reported this to the Matankys. *611 The procedure for paying partnership bills was that petitioner would indicate to Ms. Schoonover which bills were to be paid and from which bank account. She would then prepare the checks for petitioner's signature. In addition to paying partnership expenses from the partnership accounts, many checks were issued in payment of petitioner's personal expenses. Petitioner forbade Ms. Schoonover to discuss partnership business or answer any questions about the actual operation of the partnership with the Matankys, or anyone else for that matter. Once, when Ms. Schoonover questioned petitioner about his signing Dr. Matanky's name to a document, petitioner told her he had permission to sign for the doctor anytime. Petitioner had no such signatory authority. During 1974, petitioner embezzled substantial amounts of cash from Southwest Enterprises. Petitioner did this by directing Ms. Schoonover to prepare checks on Southwest Enterprises' accounts payable to himself, an entity which he controlled (GNI-Cal. or the 16200 Building), his wife (Esther Olken), or to some third party in payment of personal, nonpartnership expenses. Through this mechanism petitioner embezzled $ 107,570.76 *612 and $ 14,043,32 during 1974 and 1975, respectively. [20]
Checks totaling $ 15,637.50 were drawn in 1974 on Southwest Enterprises accounts payable to Great Northern Industries, California. These were used to cover overdrafts in GNI-Cal.'s accounts, and they were used for the personal benefit of petitioners. From the same accounts checks totaling $ 21,369.26 were drawn to Morton Olken in 1974 and deposited by him into petitioner's 16200 Building's checking account. There is no evidence that these checks were for reimbursement of Southwest Enterprises' expenses other than petitioner's uncorroborated claim. [21]
*613 In addition petitioner had 5 checks of $ 250 each, totaling $ 1,250, drawn and deposited to the 16200 Building account in 1974. Petitioner claims that these were for rental of office space. However, petitioner was not supposed to charge Southwest Enterprises rent. We include them within the embezzlement income, but note that they constitute income to petitioners no matter how we characterize the nature of the income. Checks were drawn to Esther Olken in 1974 in various amounts totaling $ 438.98, purportedly for secretarial work she provided. Petitioner had a $ 40 check written to the Conejo Valley Veterinary Clinic in 1974 for the examination of a horse petitioner was planning to purchase for his daughter. [22]
During 1974 checks in the total amount of $ 41,351.98 were drawn to the Ashley Company [23] in payment for construction of petitioners' personal residence. *614 Two checks were drawn to cash, totaling $ 400. Both were cashed by petitioner in 1974. Checks were drawn in 1974 to Crestview Escrow, Inc., totaling $ 7,532. The first, for $ 7,032, was for closing escrow on petitioners' personal residence. The second, in the amount of $ 500, was a down payment on petitioner's effort to purchase the escrow company. Checks totaling $ 11,150 were drawn in 1974 payable to Mark Hayworth, [24] who installed the sprinkler system in petitioners' personal residence. Petitioner alleged, untruthfully, that these checks were for irrigation work on the ranches but Mr. Hayworth did not do any such work. Petitioner had checks drawn representing costs for his family's personal automobiles totaling $ 1,019.37 during 1974. Various payments totaling $ 853.01 were made in 1974 on oil company credit card accounts, all for petitioner's personal benefit. Payments were made on petitioner's charge cards in 1974 in the amount of $ 2,103.99, representing personal expenses of petitioners and their family. Other miscellaneous *615 checks were drawn in 1974 for the personal benefit of petitioner totaling $ 4,424.67. [25] Three of these checks were to pay petitioners' TWA charge card. Petitioner testified that the flights were on partnership business but that was not true. Petitioner's embezzlements from Southwest Enterprises during 1975 totaled $ 14,043.32. These were broken down as follows: Checks payable to petitioner in the amount of $ 4,179.38. Checks payable to the 16200 Building in the total amount of $ 750. Petitioner was not entitled to charge Southwest Enterprises rent. These checks we have characterized as embezzlement income. $ 28 to Esther Olken for secretarial services and *616 $ 230.65 for the lease payment on her automobile. A check to GMAC totaling $ 666.92, of which $ 147 represented payment on petitioners' daughter's automobile. Checks payable to Mobil Oil in the amount of $ 618.67 and to Standard Oil in the amount of $ 954.68, all of which represented personal expenditures of petitioners and their family. Personal charge card payments were made totaling $ 1,714. TWA charge card payments totaling $ 351.17 were made;; a payment of $ 224.21 for vending machines in the 16200 Building, one for $ 243.80 for petitioner's personal automobile, $ 101.76 for a life insurance premium for Esther Olken, and $ 4,500 in payment of a personal debt of petitioner. B. Monies Embezzled Directly From the Matankys
In 1974, petitioner maintained and had complete control over the following bank accounts: 1. Great Northern Industries at Wells Fargo Bank; 2. Great Northern Industries at Crocker National Bank; 3. M. Olken, 16200 Ventura Building at Wells Fargo Bank; and 4. M. Olken, 162000 Ventura Building at Crocker National Bank.
Throughout the year petitioner requested the Matankys to write checks to various entities. These entities included MOF *617 (an informal partnership which was a forerunner of Southwest Enterprises), the Rottman Company (a drilling company unrelated to petitioner), Southwest Enterprises, the 16200 Building, GNI-Cal. and M. Olken. Petitioner always provided a facially reasonably request for the check. Generally, he would say that he needed the money for various business expenses. When he asked that checks be issued to himself or some entity which he controlled, he would tell the Matankys that he had already paid business expenses out of one of his accounts on their behalf and the checks were for his reimbursement. However, with one exception, there is no evidence in the record that petitioner ever advanced funds on behalf of any partnership in which the Matankys had an interest or on behalf of the Matankys themselves. [26] Instead petitioner would deposit the funds received into one of the various bank accounts outlined above. Where the checks were made out to an entity not controlled by petitioner, such as the Rottman Company, he forged the endorsements. *618 Through this mechanism, petitioner embezzled $ 114,850 from the Matankys during 1974. [27]
The Matankys wrote a check dated January 17, 1974, to MOF [28] in the amount of $ 5,000. This sum was used by petitioner for his own purposes and was not used on behalf of the Matankys or any of their interests. Further, they wrote a check in 1974 for $ 12,000 payable to the Rottman Company, ostensibly for drilling costs on one of the ranches. Petitioner endorsed the Rottman Company's name to the check and deposited it, as he had the $ 5,000 check, in his 16200 account. Petitioner claimed he had previously paid the drilling company and that he was therefore entitled to the check as reimbursement. This claim was not true. The Rottman Company had not been paid. Petitioner also deposited checks payable to Southwest Enterprises totaling $ 16,550 into his own accounts and used these amounts for his own purposes. He was not entitled to do so and the Matankys believed that the checks were deposited into a Southwest Enterprises' *619 account. Also during 1974 the Matankys wrote several checks at petitioner's request which they were told represented reimbursements paid on their behalf. Thus, $ 30,750 was paid to the 16200 Building, $ 27,250 to GNI-Cal. and $ 23,300 to petitioner. Of the amount paid to petitioner $ 9,300 was intended by the Matankys to be a loan to him. It was never repaid and petitioner never intended to repay it. Petitioner was not able to show that any of these amounts represented reimbursements for payments he had made on behalf of the Matankys. C. Lancaster Ranches' Note (Kelly Ranch)
When the Matankys purchased the Kelly Ranch on or about December 26, 1973, they executed a note in the amount of $ 17,500 in favor of Lancaster Ranches, Inc., the seller of the ranch, for farm equipment on the ranch. On January 15, 1974, Mrs. Matanky gave petitioner a check for $ 17,500 payable to Lancaster Ranches, Inc., to satisfy this promissory note. Petitioner did not remit the check but instead endorsed it by forgery and deposited the check into the M. Olken, 16200 Ventura Building account at Wells Fargo Bank. Petitioner had no authority to endorse the check and deposit it into the 16200 *620 Building account. Subsequently, petitioner had two checks issued on the Southwest Enterprises account payable to Lancaster Ranches, Inc., in payment of the December 26, 1973, note. [29] There is no evidence that petitioner ever repaid Southwest Enterprises or the Matankys. Accordingly, we find that through this mechanism petitioner embezzled $ 17,500 from the Matankys during 1974. D. M & O Enterprises
M & O was formed for the purpose of acquiring and developing the Encino Medical Towers. On June 1, 1974, a partnership agreement was executed by petitioners and the Matankys which was virtually identical to the Southwest Enterprises partnership agreement, [30] and the same basic relationship between petitioner and the Matankys applied. The Matankys were to acquire the Encino Medical Towers and supply all other necessary capital. Petitioner was to manage the building and receive no compensation, profits or ownership interest until the Matankys recovered their initial investment. *621 Petitioner engaged in a pattern of deceit and misappropriation of funds with respect to M & O similar to that regarding Southwest Enterprises. As the manager of the medical building he had complete and unbridled control over the partnership's bank accounts. During 1974 and 1975, M & O maintained the following bank accounts: 1. M & O Enterprises at Wells Fargo Bank; 2. M & O Enterprises at Crocker National Bank; and 3. M & O Enterprises at City National Bank.
Petitioner had signatory authority over these accounts. Bills were paid in the same manner as they were for Southwest Enterprises, with petitioner directing Ms. Schoonover (who performed similar tasks for M & O as for Southwest Enterprises) to prepare the checks for his signature. It was up to petitioner to decide which bills were to be paid. As with Southwest Enterprises, the Matankys had little to do with the day-to-day operations of the partnership. They left this to petitioner, whom they trusted and admired. At the direction of petitioner, Ms. Schoonover prepared a series of checks in 1974 and 1975 out of the M & O accounts payable to either petitioner, a member of his family, an entity which he controlled *622 or some unrelated third party in payment for personal services rendered or goods sold to petitioners. These checks all represented payments for nonpartnership expenses and went to the personal use and enjoyment of petitioners. During 1974 and 1975, petitioner embezzled $ 45,289.84 and $ 11,036.17, respectively, through the diversion of M & O Enterprises' checks. [31]
During 1975, petitioner developed and engaged in another scheme to divert funds from M & O Enterprises and put them to his personal use and enjoyment. Petitioner commenced diverting the rent checks coming into the partnership from tenants in the Encino Medical Towers, the partnership's principal asset, into his personal account, the M. Olken 16200 Ventura Building account at Crocker National Bank. Petitioner had no authority to deposit rent checks from the Encino Medical Towers into this account. There is no evidence of any repayment of these funds by petitioner to M & O. During 1975, petitioner diverted rental payments due to M & O totaling $ 30,430.11 into his 16200 Building account. [32]
*623 E. CEIR Building Transaction
Sometime late in 1974, M & O attempted to acquire another office building commonly known as the CEIR Building. On November 15, 1974, Dr. Matanky and petitioner, as general partners of M & O, executed a mortgage loan application with American International Mortgage Corporation (hereinafter "American"). On that same date and in connection with the loan application, John D. Kramer (an employee of Great Northern Industries) submitted a $ 27,750 check as a good faith deposit on behalf of M & O. The check was drawn on the GNI-Cal. account at Crocker National Bank. On November 19, 1974, the Matankys delivered to American a cashier's check drawn on Continental Bank payable to American in the amount of $ 27,750. This check was to replace the November 15, 1974, check of GNI-Cal., which was then returned to John Kramer and received by him on November 22, 1974. The Matankys and a Mr. Charles Bluth borrowed the $ 27,750 from Continental Bank. The arrangement with American was that if the purchase of the CEIR Building was not consummated, the cashier's check from Continental Bank was to be returned to that bank. The purchase eventually fell through. *624 On January 21, 1975, petitioner requested American to return the $ 27,750 deposit to M & O Enterprises, and American complied by sending a cashier's check in the amount of $ 27, 750 on January 23, 1975, but it was payable to GNI-Cal. John Kramer acknowledged receipt of the funds. The check was deposited into the GNI-Cal. bank account at Crocker National Bank. The release provided to American to obtain the return of the $ 27,750 deposit contained a signature of Dr. Matanky that was forged by petitioner. The Matankys did not know that their funds were returned to GNI-Cal. nor did petitioner ever inform the Matankys of this. Continental Bank was not repaid its $ 27,750 loan and eventually sued the Matankys and Mr. Bluth for repayment. We find that petitioner embezzled this $ 27,750 during 1975. F. Bankruptcy of Southwest Enterprises
During April 1975, Southwest Enterprises filed a petition in bankruptcy. Shortly thereafter, Ms. Schoonover advised the Matankys about some of the irregularities regarding Southwest Enterprises and M & O. During May 1975, Ms. Schoonover obtained Southwest Enterprises partnership's records (as well as M & O records) from petitioner's office *625 in the 16200 Building. It is unclear whether the records were obtained prior to or pursuant to a Bankruptcy Court order. They eventually were turned over to the trustee in bankruptcy, Sam Jonas. Commingled with Southwest Enterprises' records were some of petitioner's personal records. These were returned to petitioner in the same month. On November 7, 1977, the trustee made the records of Southwest Enterprises available to the Matankys and petitioners. It was not until Southwest Enterprises filed in bankruptcy that the Matankys became aware of the extent of petitioner's illegal activities. On September 12, 1975, the Matankys filed a suit in Los Angeles Superior Court against petitioner alleging 10 different causes of action, including fraud, conversion and negligent misrepresentation and requesting the imposition of a constructive trust in favor of the Matankys. In connection with the suit the Matankys filed a Lis Pendens to give prospective transferees of the 16200 Building notice of the law suit and the fact that the Matankys asked for a constructive trust in regard to that building. During April of 1976, the Matankys filed a complaint with the Los Angeles County District *626 Attorney's office (hereinafter "LADA") alleging that petition had engaged in acts of grand theft by fraud, forgery and filing of fraudulent documents. The LADA investigated the complaint, in the course of which several search warrants were executed. Many of petitioner's personal documents were seized pursuant to these warrants. [33]
Criminal charges were eventually brought against petitioner in regard to his embezzlement of funds from Southwest Enterprises, M & O and the Matankys. Petitioner pleaded nolo contendere, was convicted and served approximately seven months in various facilities maintained by the California Department of Corrections for his Matanky activities. Petitioner was incarcerated on October 18, 1978, and released December 25, 1982. (His time after the first 7 months related to a subsequent criminal conviction which will be discussed later.) III. Rental Income
As previously discussed, on September 26, 1973, the Matankys executed a Grant Deed transferring title to the 16200 Building to petitioner. That deed listed GNI-Ill. as the *627 grantee; however, GNI-Ill. was nonexistent. [34] Petitioner claims that GNI-Ill. was a viable corporation but placed no testimony in evidence to support his contention. The record reveals otherwise. Essentially, on the date of transfer (the escrow closed on October 10, 1973 and the deed was recorded on the same date) petitioners as individuals took control of the 16200 Building. On October 24, 1973, petitioners (as "officers" of GNI-Ill.) executed a quitclaim deed for the 16200 Building quitclaiming it to "Morton Z. Olken and Esther Oklen, as community property." This deed was not recorded until December 23, 1974. On December 19, 1973, petitioner (as president of the nonexistent GNI-Ill.) executed a Grant Deed granting title to the 16200 Building back to the Matankys, who then executed a Grant Deed granting title to "Great Northern Industries, Inc. -- a California Corporation," which had become incorporated on November 15, 1973. It was formed and entirely controlled by petitioner. On February 3, 1975, GNI-Cal. was suspended from operating as a California corporation and was restored on April 11, 1975. GNI-Cal. was permanently suspended from *628 operating as a California corporation on December 1, 1976. The corporation maintained no books, minutes [35] or records, except for a couple of checking accounts. There was no initial capitalization of GNI-Cal. when it was formed nor did it show any gross receipts in 1974. The corporation did not file a Federal Corporate Income Tax Return for 1973 and returns filed for subsequent years showed absolutely no corporate activity. GNI-Cal. was nothing more than a tool used by petitioner to facilitate his deception of the Matankys and anyone else who was or might have been the target of his deceit. [36]
On July 11, 1975, petitioners as individuals executed a deed of trust respecting the 16200 Building in favor of the Title Insurance and Trust Company and Douglas Eve, in regard to a loan to petitioners. On September 22, 1975, petitioner *629 executed an Individual Grant Deed granting title to the 16200 Building to GNI-Cal. [37] That corporation on December 30, 1975, executed (by petitioners as officers) a Corporation Grant Deed granting title to "The Rock, Ltd. a Limited Partnership." The Rock was unrelated to petitioners. We find that GNI-Cal. never operated as a business in 1973, 1974 or 1975 and existed only to facilitate petitioner's fraudulent activities. Despite GNI-Cal.'s having been listed as the grantee of the 16200 Building on numerous deeds, we find that the 16200 Building was from October 10, 1973, until its sale to the Rock, Ltd., owned by petitioners as individuals. [38]
*630 During 1974 and 1975, while petitioners owned and operated the 16200 Building, there were schedules prepared of the building's rental receipts and rental disbursements. [39]
Petitioner included numerous personal expenses on these schedules so that the expenses would appear as legitimate rental expenses. Some of the mischaracterizations are as follows: 1. Petitioner listed a $ 950 expense from "Las Virgenes Water" on the February 1974 expense schedule. This expense was for a water bill and sewage fee for petitioners' personal residence; 2. Petitioner listed $ 3,683 as "office furniture" expenses from Ashley Furniture and Ashley Interiors, on the February 1974 expense schedule. These expenses were for interior decorating at petitioners' personal residence; 3. Petitioner listed a $ 20,000 expense for "construction of Suite 213" by Ashley Construction on the September 1974 expense schedule. Ashley Construction did not do any construction work at the 16200 Building during 1974. This expense was incurred for the construction of petitioners' *631 personal residence; 4. Petitioner listed a $ 208.33 expense as a "fee" to Stuart Hackel on the November 1974 expense schedule. This expense represents a monthly payment to Stuart Hackel on a second deed of trust on petitioners' personal residence. Stuart Hackel did not render any services to the 16200 Building; 5. Petitioner listed a $ 5,454.74 "machine rental" expense from Carwell Corporation on the December 1974 expense schedule. This expense represents the down payment petitioner submitted on the lease of his personal Mercedes Benz automobile; 6. Petitioner listed a $ 100 expenses for "outside secretarial" work by his daughter, Melody Olken, on the December 1974 expense schedule. Melody Olken never rendered any secretarial services to the 16200 Building; 7. Petitioner listed a $ 233.80 "car rental" expense from City National Bank on the January 1975 expense schedule. The expense represents a monthly payment for petitioner's personal Mercedes Benz automobile; 8. Petitioner listed a $ 125 "gardening" expense from Tom Ryono on the February 1975 expense schedule. This expense was for gardening at petitioners' personal residence. Tom Ryono never rendered any services *632 to the 16200 Building; and 9. Petitioner listed a $ 200 expense from "Kyoka" on the February 1975 expense schedule. The amount was paid to petitioners' personal housekeeper, Kyoka Tochimura. During 1974 and 1975, the 16200 Building operated at a profit. When only properly deductible expenses are taken into account, the Building had net rental income of $ 63,379.46 and $ 61,832.85 for 1974 and 1975, respectively. These figures are computed as follows: 1974
1975
Gross rental receipts
$ 207,358.00 $ 229,441.00 Less (properly
substantiated rental
expense)
(123,626.54)
[40](148,006.15)
Less (allowable
depreciation)
( 19,602.00)
( 19,602.00)
Net rental income
$  64,129.46 $  61,832.85 Less (duplicated amount)
750.00 $  63,379.46 The net rental income for 1974 must be reduced in order to avoid duplication by three payments of $ 250 each from Southwest Enterprises which have already been included in petitioner's 1974 income as amounts embezzled by petitioner. These three payments were shown as rentals on the 16200 Building schedules and we delete *633 them here to avoid duplication. Petitioners failed to substantiate any allowable deductions in addition to those allowed above. Since petitioners were the owners of the 16200 Building the net rental income during 1974 and 1975 is income to them in the amounts of $ 63,379.46 and $ 61,832.85, respectively. IV. Partnership Income
On their 1974 income tax return, petitioners reported no income from either Southwest Enterprises or M & O Enterprises. For 1974 a partnership return was filed for M & O Enterprises which indicated that petitioners received $ 9,965 in partnership income and respondent included this figure in his computation of unreported income. Respondent also included partnership income of $ 47,199 in the unreported income for 1975. Petitioner placed no specific evidence into the record in regard to these items. Both the M & O and Southwest Enterprises partnership agreements, however, made it clear that petitioner did not have such income. V. Capital Gain Income
On December 30, 1975, the Rock, Ltd. (hereinafter "Rock") partnership purchased the 16200 Building. Herb Halpern, a partner in Rock, negotiated the transfer on behalf of Rock. [41] Petitioner *634 represented himself as the president of GNI-Cal. and indicated that GNI-Cal. was the owner of the 16200 Building. The escrow for this transactions closed on December 31, 1975. Although the parties treated GNI-Cal. as the seller of the 16200 Building, it was petitioner who actually received the compensation paid by Rock. The purchase price was $ 1,504,000. Petitioners' adjusted basis in the property was $ 1,220,004. [42] Petitioners' gain on this sale was $ 283,996. *635 Throughout the negotiations, petitioner made numerous material misrepresentations prior to the close of the escrow. [43] Eventually, Rock discontinued payments on its notes to GNI-Cal. and in 1976 brought an injunction action to prevent default being declared on the notes. In 1981 a default judgment was entered by the Los Angeles Superior Court granting judgment to plaintiffs in the amount of $ 680,000 plus costs, an amount substantially in excess of the note obligations. *636 VI. Victor Lundin & Associates
During 1976, petitioner began working for his cousin Victor Lundin, who at the time owned an insurance brokerage business called V. R. Lundin & Associates Insurance Marketing (hereinafter "VLA"). [44] Lundin was engaged in the business of selling all forms of health and life insurance and the establishing of self-insurance and reinsurance programs as provided for under the Employee Retirement IncomeSecurity Act (ERISA). It is unclear whether Lundin was aware of petitioner's pending criminal matter regarding the Matanky embezzlements at the time petitioner began working with him. Petitioner continued to be associated with this business until February 1978. Victor Lundin (hereinafter "Lundin") brought petitioner into these businesses because he knew of petitioner's experience in insurance administration. Lundin was more familiar with the sales and marketing aspects of an insurance business and therefore was appreciative of petitioner's background in administration. *637 As the administrator of these various businesses, [45] petitioner managed the office. His duties included depositing and disbursing company funds, bookkeeping, training new employees and maintaining the company's checking accounts, over which he had signatory authority. [46] During 1976, petitioner also went out in the field on weekends to sell insurance with Lundin. During 1977, when the business was more heavily involved with self-insurance under ERISA, petitioner established procedures for the administration of claims. This required setting up premiums with various actuaries, contacting the insurance carriers on a regular basis and handling premium payments and refunds on the various policies. During the years in issue, most of the mail *638 received by VLA, UWIM and GNA was handled by petitioner. This mail included checks for refunds of insurance premiums. Petitioner had his own office in the company offices. He had a private lock on his office door and granted no one, not even Lundin, access to his office. Sometime towards the end of 1977, Lundin gained access to petitioner's office and found a $ 50,000 check drawn by petitioner on the GNA account. This check apparently represented a deposit in a real estate transaction and never cleared the bank. Petitioner had forged Lundin's signature on this check. At no time was petitioner given authority to sign Lundin's name to checks or other insurance company documents. Lundin consulted with his attorney and was advised to watch petitioner carefully. During the early part of 1978, Lundin again gained access to petitioner's office. This time he discovered deposit slips, canceled checks and other funds from VLA, UWIM and GNA. After this discovery Lundin arranged a meeting with petitioner and their respective attorneys. Petitioner admitted to stealing money from the companies. He told his cousin he needed the money. Petitioner's fraudulent misappropriation of funds *639 took three basic forms. One scheme involved the issuance of VLA, UWIM or GNA checks to companies or persons who did business with petitioner or to fictitious persons. Petitioner would forge Lundin's name to these checks. He would also forge the endorsements on these checks. These checks would then be deposited into either petitioner's personal checking account at Lloyds Bank of California or his wife's checking account at Security Pacific Bank. Through this mechanism, petitioner embezzled $ 2,069.46 and $ 65,108.97 in 1976 and 1977, respectively. [47]
Some of these checks were made payable to Mr. or Mrs. Olken. Many others were made payable to various insurance companies with which the Lundin companies did business, such as Colony Charter Life (forged checks totaling $ 16,479.60), Republic National Insurance Company (forged checks totaling $ 18,100.48) and Director's Life Insurance Company (forged checks totaling $ 3,118.66). Petitioner also had checks drawn payable to Tex Ritter, the owner of a printing firm which did business with the Lundin companies. These checks, to which petitioner forged Mr. Ritter's name, totaled *640 $ 4,021.50. Similarly, petitioner had checks drawn to an attorney, Barry Resnick, totaling $ 3,275. As with the other checks in this group, petitioner forged Mr. Resnick's name and deposited the checks into petitioner's account. The Hansen Company is an actuarial consulting firm. Petitioner had checks totaling $ 2,975 drawn to A. S. Hansen. He then forged the endorsements and deposited them into his personal account. Petitioner started but did not complete the process of forming California Travelers Life Insurance Company in Arizona. Petitioner had checks drawn on Lundin accounts totaling $ 6,750 which he deposited into an account which he maintained in that company's name. There was no business purpose for issuing checks to this entity, which was not in existence. A group of checks were issued to insureds and some fictitious payees, totaling $ 1,192.05. Petitioner endorsed these checks and deposited them into his personal account. Yet another group of checks was drawn to various salesmen for the Lundin companies and other persons totaling $ 5,884.84. Petitioner forged endorsements on these checks and deposited them in his personal account. Petitioner also had *641 drawn a group of checks on various Lundin companies' accounts which he used for his own personal purposes. These checks were not deposited by petitioners in their own accounts, but had no relation to the Lundin businesses. [48] These totaled $ 1,725.41 in 1976 and $ 368.75 in 1977. Another of petitioner's schemes involved checks received by VLA, UWIM or GNA from clients or related businesses. Petitioner would forge the endorsement on these checks and deposit them into either his account or his wife's. In this manner, petitioner embezzled $ 34.73 and $ 3,421.37 in 1976 and 1977, respectively. [49] Many of these amounts were very small premium refunds payable to various insureds. Some were large amounts payable to Mr. Lundin and his various businesses. Thus, petitioner's forgeries in this regard *642 ranged from 62 cents to $ 608.49. VLA issued a Form W-2 to petitioner for 1977. This form was based upon payroll checks drawn on the company's accounts during that year. It does not represent any of the stolen or embezzled amounts set forth above. Petitioner attempted to cover up his embezzlement from VLA, UWIM and GNA by claiming that the fraudulent endorsing of checks into his account was part of a money laundering scheme between Lundin and himself. Lundin, who was not a part of any such scheme, filed a complaint against petitioner with the Los Angeles District Attorney and petitioner eventually pleaded nolo contendere to criminal charges which resulted from the investigation. He served time in various institutions operated by the California Department of Corrections as a result. All the embezzled funds went to petitioner's personal use and enjoyment. There is no evidence whatsoever of repayment to Lundin of any embezzled funds. Respondent dtermined that petitioner earned $ 18,000 in wages from VLA each year for 1976 and 1977. The record indicates that petitioner drew a check each *643 week from the company. Towards the end of 1977 petitioner's net pay was $ 750.33 per week. We find that petitioner earned at least $ 18,000 in wages for 1976. Petitioner reported total wages from Lundin for 1977 in the amount of $ 31,146. We find respondent's determination as to 1977 is erroneous. ULTIMATE FINDINGS OF FACT 1. During 1973, 1974 and 1975, neither GNI-Cal. nor GNI-Ill. operated as viable corporations doing business in any state. 2. In 1973 petitioner earned a commission of $ 49,500 as a real estate broker in his purchase of the 16200 Building from the Matankys. He applied this is a reduction of the purchase price. 3. In 1973 petitioner received a note for $ 11,700, the value of which was $ 11,700, as his commission as real estate broker in the acquisition by the Matankys of the Almondoz Ranch. 4. In 1973 petitioner received a note for $ 47,520, the value of which was $ 47,520, as his commission as real estate broker in the acquisition by the Matankys of the Kelly Ranch. 5. In 1974 petitioner received a cash commission of $ 21,000 as real estate broker in the acquisition by the Matankys of he Wright Ranch. 6. In 1974 petitioner received a note *644 for $ 16,500, the value of which was $ 16,500, as his commission as real estate broker in the acquisition by the Matankys of the Tullos Ranch. 7. In 1974 petitioner received a cash commission of $ 30,000 as real estate broker in the acquisition by the Matankys of the Encino Medical Towers. 8. In 1974 petitioner received embezzlement income as follows: Southwest Enterprises
$ 107,570.76
Matankys
114,850.00
Lancaster Ranches Note
17,500.00
M & O Enterprises
45,289.84
$ 285,210.60
9. In 1974 petitioner received net rental income from the 16200 Building in the amount of $ 63,379.46. 10. In 1974 petitioner did not receive partnership income from M & O Enterprises of $ 9.965, nor did he receive partnership income of $ 47,199 in 1975. 11. In 1975 petitioner received embezzlement income as follows: Southwest Enterprises
$ 14,043,32
M & O Enterprises
41,466.28
CEIR Building Transaction
27,750.00
$ 83,259.60
12. In 1975 petitioner received net rental income from the 16200 Building in the amount of $ 61,832.85. 13. In 1975 petitioner realized a gain of $ 283,996 upon the sale of the 16200 Building to The Rock, Ltd. *645 14. During 1976 and 1977 petitioner received embezzlement or theft income from VLA, UWIM or GNA of $ 3,829.60 and $ 68,899.09, respectively. 15. During 1976 petitioner received at least $ 18,000 in wages from VLA, UWIM or GNA which was not reported. Petitioner reported his 1977 wages from this source. 16. Respondent failed in his burden of proving that Esther Olken underpaid her taxes due to fraud in any of the years in question. 17. Respondent sustained his burden of proving that Morton Olken underpaid his taxes due to fraud in each of the years in question. 18. Esther Olken failed to sustain her burden of proving she was an "innocent spouse." OPINION The bulk of this case involves whether respondent has properly determined that petitioners had unreported taxable income during the years in issue from the various sources indicated. Before discussing each of these income items, it is necessary to set forth some general principles. With certain exceptions, there is a presumption of correctness which attaches to respondent's deficiency determination and it is petitioners' burden to show otherwise. Welch v. Helvering,290 U.S. 111 (1933). Rule *646 142(a) provides as follows: (a) General: The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon the respondent. * * *
It is apparent, therefore, that with respect to the determination of income, except for the one item raised by respondent in his second amended answer, [50] the burden rests with petitioners to show they did not receive the income as determined by respondent. With respect to the addition to tax for fraud, the burden of proof rests upon respondent and is to be carried by clear and convincing evidence. [51] Rule 142(b). The discussion of the income items will follow the same pattern as do the facts relevant to each item. I. Commission Income
Section 61(a) provides: Except as otherwise provided in this subtitle, gross income *647 means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, fringe benefits, and similar items * * *. [Emphasis added.] Petitioner acted as a real estate broker in numerous transactions during 1973 and 1974. In each of these transactions petitioner earned a commission. Each transaction will be discussed separately. A. 16200 Ventura Boulevard Building Transaction
Petitioner first approached the Matankys regarding the purchase of the 16200 Building during the summer of 1973, and at that time represented to the Matankys that he intended to purchase the 16200 Building as an individual. [52] Petitioner also told the Matankys that he had an Illinois real estate broker's license and that the license was recognized in California through a reciprocal arrangement. The parties agreed that petitioner could act as the real estate broker in the transaction and he did so act, representing himself as well as the sellers. *648 Petitioner basically structured the entire 16200 Building transaction. One of the terms of sale was that petitioner's real estate commission of $ 49,500 was to be used to reduce the purchase price of the building. As state above, commissions are specified as an item of gross income by the Internal Revenue Code. Sec. 6(a)(1). The fact that commissions received by a taxpayer are derived from a transaction in which the taxpayer is purchasing for his own account does not alter the commission's character as income to him. Commissioner v. Daehler,281 F.2d 823 (5th Cir. 1960), revg. 31 T.C. 722 (1959). See also Williams v. Commissioner,64 T.C. 1085 (1975), where we held that the taxpayer in that case, a real estate salesman who purchased property from his employer on his own account, had commission income regardless of his attempt to recharacterize it as a reduction in the purchase price. 52a In that case we stated at 1089: Petitioner attempts to avoid characterization of the commissions as income by calling them a reduction in price. While it is true that petitioner's out-of-pocket costs are 10 percent less than that of other purchasers, *649 the purchase price paid by him was exactly the same for him as it was for any other purchaser. Any reduction in petitioner's out-of-pocket costs was the result of the commission paid him by [the seller], not a reduction in price. Petitioner's costs were less than those of other purchasers since he had done what none of the other purchasers had done -- rendered services to [the seller], for which he was paid his usual commission. [The seller] did not lower the price of the properties for petitioner, nor did it sell the property to petitioner at a bargain price. It sold the property to him at its normal price, for which petitioner was paid a commission. Petitioner did not purchase the 16200 Building at any sort of reduced price. Instead he was able to reduce the purchase price after receiving his commission of $ 49,500. The escrow document makes clear that petitioner had earned the commission. It was at his request that the *650 escrow company credited the $ 49,500 to the Matankys, who were quite impressed with the way petitioner structured the transaction, using his broker's commission as a down payment. This allowed petitioner to purchase the 16200 Building without any out-of-pocket costs. Petitioner argues that the $ 49,500 commission amount should be attributable to GNI-Cal. because GNI-Cal. and not petitioner purchased the 16200 Building and received the benefit of the reduction in price by the commission amount. The record, however, reveals that GNI-Ill., a nonexistent corporation, was originally shown as grantee. Petitioner was unable to prove that such a corporation existed and we hold that petitioner purchased the property for his own account. Petitioner never held himself out to the Matankys as an agent, officer or director of any corporation during his negotiations for the 16200 Building. Petitioner also prepared several transfer documents which conveyed title to various parties before and after the October 10, 1973, transaction date. The transfer documents show that petitioner exercised control over the 16200 Building from the time the Matankys transferred title to the building. [53] As *651 we will discuss more fully, infra, petitioner continued to treat the 16200 Building as a personal asset irrespective of the fact that either GNI-Ill. or GNI-Cal. retained title to the building. In any event, regardless of who actually purchased the 16200 Building, the $ 49,500 is taxable income to petitioner under the assignment of income doctrine. It has long been established that income is taxable to the individual who earned the right to the income or has otherwise exercised dominion and control over its disposition. Helvering v. Horst,311 U.S. 112 (1940); Lucas v. Earl,281 U.S. 111 (1930). It was petitioner who earned the commission as broker in this transaction. He negotiated the sale of the building, he structured the transaction and he exercised control over the commission by having it credited to the purchase price. Even assuming arguendo that GNI-Ill. was viable and did, in fact, purchase the building, petitioner's use of the commission to reduce the purchase price is nothing more than an anticipatory assignment of income. In United States v. Allen,551 F.2d 208 (8th Cir. 1977), it was held that a real estate salesman *652 who sold a house to his parents and surrendered his commission upon the sale to his parents, had taxable income in the amount of the commission. "The crucial factor again is Allen's [the taxpayer] unrestricted dominion over the commission proceeds and his right to divert them to whatever use he deemed appropriate." United States v. Allen, supra at 212. Petitioner, likewise, had unrestricted dominion over the commission proceeds, which he exercised by diverting the funds for use a down payment. The $ 49,500 amount is includable in petitioners' gross income for the 1973 tax year. B. Ranch Transactions
Petitioner *653 earned commissions from four real estate transactions during late 1973 and early 1974. These transactions were the result of an oral agreement, later placed in writing, between petitioner and the Matankys regarding their investing in a farming operation. The understanding between the parties was that petitioner would locate ranch properties, the Matankys would purchase the ranches and petitioner would manage them. Once the Matankys recouped their investment from the ranches, Morton and Esther Olken would be entitled to a 50-percent ownership in the properties and in the income derived from them. The Matankys would retain the remaining 50-percent interest. Almondoz Ranch
[54]
The Almondoz Ranch was the first ranch that the Matankys purchased in 1973. Petitioner, as the Matankys' real estate broker, helped negotiate and structure the terms of acquisition of the Almondoz Ranch, transferred *654 monies to and from the escrow company for the Matankys and transmitted the transactional documents to the Matankys for their signatures. Petitioner also kept all of the records of the Matankys' transaction. After the Almondoz Ranch escrow opened, additional escrow instructions were signed by the Matankys, which provided that petitioner would receive an unsecured promissory note in the amount of $ 11,700 from the Matankys as payment of his commission. Petitioner also approved the additional escrow instructions on November 29, 1973. On December 11, 1973, the Matankys executed a promissory note in favor of petitioner in payment of his broker's commission from the Almondoz Ranch transaction. Petitioner received this note from the Matankys on or around December 11, 1973. Petitioner kept an original copy of the note in a file he maintained at his office in the 16200 Building, from where he managed the ranches. When Southwest Enterprises filed for bankruptcy in 1975, and documents were seized pursuant to a Bankruptcy Court order, this was one of the documents recovered. Respondent has clearly demonstrated to the Court that petitioner received the $ 11,700 note as a commission for his *655 work on the Almondoz Ranch transaction. Notes or other evidence of indebtedness received in payment for services constitute income in the amount of their fair market value in the year of receipt. Sec. 1.61-2(d)(4), Income Tax Reg.; Dial v. Commissioner,24 T.C. 117, 122 (1955). Respondent contends that the fair market value of the note received is equal to its face value and therefore the entire $ 11,700 should be included in petitioner's income for 1973. Generally, the burden of proof is on the taxpayer to show that respondent's determination of fair market value is erroneous. See, e.g., Kingsbury v. Commissioner,65 T.C. 1068, 1091 (1976). With respect to this note, however, respondent has the burden of proof since he raised it as a new matter. Several factors support respondent's contention that the fair market value of the note equals its face value. The term of the note is very short. It matured on February 15, 1974, a little more than two months after it was issued. The note carried an interest rate of 8 percent per annum, so there is no need to discount the note. Cf. Potter v. Commissioner, a Memorandum Opinion of this Court dated *656 February 28, 1946. The obligees on the note, the Matankys, were in a sound financial position at the time the note was made. See Board v. Commissioner,18 B.T.A. 650 (1930). The note was unconditionally payable in cash, was negotiable and provided no contingencies which would affect repayment of the principal amount. Considering all of the above, we find that respondent has sustained his burden of proving the fair market value of the note. We conclude the note had a fair market value of $ 11,700 when it was received by petitioner and that amount is includable income for 1973. Kelly Ranch (Lancaster Ranches, Inc.)
The Kelly Ranch was the second ranch which the Matankys purchased in 1973. As the Matankys' real estate broker, petitioner assisted in negotiating and structuring the transaction, transferred the Matankys' funds to the escrow company and kept all of the records of the transaction for the Matankys. The Matankys purchased the Kelly Ranch on or about December 26, 1973, and on that date executed a promissory note in the amount of $ 47,520 for a broker's commission. Respondent contends that the $ 47,520 broker's commissioner that the Matankys *657 paid in the Kelly Ranch transaction was paid to petitioner. Petitioners dispute this because the copies of the escrow documents and $ 47,520 promissory note that were admitted into evidence indicate that Great Northern Industries, not petitioner, received the broker's commission. It was the intent of the Matankys that the purpose of the note was to pay petitioner a broker's commission from the Kelly Ranch transaction. Petitioner performed those services and he received the note for them. As we indicated in our discussion regarding the 16200 Building transaction, it is simply irrelevant which name was indicated on the escrow documents [55] as petitioner performed the services on his own behalf. The note constituted income to him. Assuming arguendo that the promissory note was originally made in favor of GNI-Cal. instead of petitioner, petitioner would still be taxable on the value of the *658 note. In order for a corporation to be the recipient of income, the corporation must have earned the income. Kimbrell v. Commissioner,371 F.2d 897 (5th Cir. 1967), affg. T.C. Memo. 1965-115, citing Helvering v. Horst,311 U.S. 112 (1940); Lucas v. Earl,281 U.S. 111 (1930). As Sylvia Matanky repeatedly stated, she and her husband dealt with petitioner. He was their broker, not some corporation that she was unaware of at the time of the transaction. The record is clear that petitioner provided all of the broker services and thus he, not GNI-Cal., earned and received the $ 47,520 commission from the Matankys. Respondent determined that the fair market value of the note was its face value of $ 47,520. The note was for only two months, and it carried interest. Petitioner has not put forth any evidence that the note's fair market value was less than its face value and it is his burden to do so. Kingsbury v. Commissioner, supra.We therefore conclude that in 1973 petitioner earned commission income of $ 47,520 from the Kelly Ranch transaction. Wright Ranch
During March 1974 petitioner acted *659 as the Matankys' real estate broker in their purchase of the Wright Ranch. Petitioner received a cash commission of $ 21,000 out of the Wright Ranch escrow account although this violated his agreement with the Matankys. The record is replete with evidence that this amount was received in cash by petitioner. The payment was made in accord with the Real Estate Purchase Contract and Receipt for Deposit. Also, the Matankys' escrow closing statement from the Wright Ranch transaction shows that petitioner was paid a $ 21,000 commission. Finally, petitioner admitted in a letter, dated August 15, 1974, to Ira Boren, that he had received the $ 21,000 commission. Petitioner misrepresented the truth at trial about the receipt of this commission, just as he consistently and interminably misrepresented the truth about numerous matters throughout the course of this hearing. Tullos Ranch
During February 1974 the Matankys purchased the Tullos Ranch. As real estate broker, petitioner negotiated the terms of sale, transferred funds in and out of escrow for the Matankys and kept the Matankys' records of the transaction. On February 25, 1974, the Matankys executed a promissory note in the *660 amount of $ 16,500 in favor of petitioner. This note which represents petitioner's commission from the Tullos Ranch transaction, was delivered to him at the close of escrow as provided in the Tullos Ranch escrow instructions. Petitioner kept the original copy of the note in the Tullos Ranch file he maintained at his office in the 16200 Building. There is no question concerning whether petitioner received this note (despite his claims to the contrary), nor did petitioner marshal any credible evidence respecting the fair market value of the note. We note that there was a two-month maturity date on this note, also. We conclude that petitioner received the note as his commission from the Tullos Ranch transaction and that the note had a fair market value of $ 16,500. Petitioner therefore received commission income of $ 16,500 in 1974. C. Encino Medical Towers Transaction
During 1974 the Matankys acquired the Encino Medical Towers. Petitioner received a $ 30,000 commission in this transaction in the form of a check. Petitioner by letter acknowledged his receipt of this amount. Further, the record contains a copy of the check and check statement indicating petitioner *661 received a gross commission of $ 30,000. When questioned about the above-mentioned letter, check and check statement, petitioner was either very evasive or conveniently claimed a lack of recollection. Petitioners claimed that the Encino Medical Towers commission is not taxable to them because the commission amount was credited to the purchase price. This was not the case. It did not happen. Petitioner received a $ 30,000 check for the commission in 1974. Respondent's determination is correct. II. Great Northern Industries
Petitioner contends that Great Northern Industries, an Illinois corporation, originally purchased the 16200 Building or from time to time contends that GNI-Cal. purchased it. The Real Estate and Purchase Agreement in fact does indicate that a $ 1,000 deposit was placed in escrow closing statement dated October 10, 1973, in regard to the same transaction, refers to GNI-Ill. However, a certified statement from the Secretary of State of Illinois indicates that no corporation of that name existed in Illinois during 1973. We find that there was no such corporation in existence in 1973. Petitioners caused to be formed a California corporation under *662 the same name on November 15, 1973. [56]
Petitioner caused various title transfers to be made in regard to the 16200 Building. These transfers were as follows: 9/26/73
Matankys to GNI-Ill. -- grant deed (recorded
10/10/73)
12/9/73
GNI-Ill. to Olkens -- quitclaim (recorded
12/23/74)
12/19/73
GNI-Ill. to Matankys (recorded 12/20/73)
12/19/73
Matankys to GNI-Cal. (recorded 12/20/73)
7/11/75
Olkens as individual to Title Ins. & Trust Co.
and D. Eve, a deed of trust (recorded 9/19/75)
9/22/75
Olkens to GNI-Cal. (recorded 9/26/75)
12/30/75
GNI-Cal. to The Rock, Ltd. (recorded 12/31/75)
Petitioners always held themselves out as owners of the building, regardless of where bare legal title might have been at any given moment. Thus, on their 1973 return they treated the building as theirs for purposes of reporting income and deductions, including depreciation. *663 They represented themselves as the owners on financial statements for personal loans and they executed as individuals a deed of trust in order to secure an $ 18,000 personal loan. In addition, Morton Olken in his individual capacity filed a Fictitious Name Statement that he was doing business as $ 16200 Ventura Building." Petitioners held the 16200 Building as a personal asset, irrespective of bare legal title. GNI-Cal. carried on no business activity whatsoever other than to function as a conduit for the passage of funds. A Federal corporate tax return was filed by petitioner on behalf of GNI-Cal. for 1974. It did not set forth gross receipts, deductions or taxable income information, setting forth solely the word "inactive" on the gross receipts line. No returns were filed for 1973, 1975 and 1976. Petitioner did file California Corporation Franchise Tax returns for GNI-Cal. for the years ended October 31, 1974 and October 31, 1975. Neither of those returns shows any business activity whatsoever. On both returns, the response to the line "Exact date began business in California" was "10-1-74." In fact, GNI-Cal. never began business. GNI-Cal. was not formed for any business *664 purpose. It did not carry on any business after its incorporation. It was no more than a convenient sham to facilitate petitioner's various activities, legal and otherwise. We accordingly hold that it has no existence for tax purposes. Moline Properties, Inc. v. Commissioner,319 U.S. 436, 438-439 (1943). III. Unreported Rental Income
(a) Duplication of Income
Petitioner argues that he has had income asserted against him as embezzlement income for five Southwest Enterprises checks of $ 250 each drawn to and deposited into the 16200 Building account in 1974, and then in effect duplicated as unreported rental income to him from the 16200 Building. We believe that petitioner is correct in this regard as to three payments of $ 250 each for Suite 401 of the building for the months of September, October and December of 1974 and we have deleted these amounts. (b) Rental Expenses
Petitioners failed to report rental income from the 16200 Building. Respondent determined that petitioners had unreported net rental income of $ 190,081 and $ 209,839 for 1974 and 1975, respectively. Petitioners failed to report any amounts whatsoever for either year. *665 Petitioners stipulated to the amount of gross rentals received in each year from the building, and respondent reduced that amount by substantiated rental expenses. Respondent's assertion of the resulting unreported rental income was in the amount of $ 64,129 and $ 61,833 for 1974 and 1975, respectively. We have held above that petitioners owned and operated this building for their own account. Any profits or losses, therefore, affect their personal gross income. Petitioners failed completely to bring forth any evidence which would serve to increase the amount of rental expenses over those allowed by respondent in either year. That is their burden. Rule 142(a). They did, however, prove that the gross rental income should be reduced by $ 750 for 1974 because of duplication. Accordingly, we hold petitioners had net rental income in the amount of $ 63,379.46 and $ 61,832.85 for 1974 and 1975, respectively. (c) Real Property Tax
Petitioners proved that they paid real property taxes on the 16200 Building in the amount of $ 17,959.83 in 1973 and $ 27,850.57 in 1975, which are in addition to $ 30,882 for 1975 which respondent allowed. Pettioners will be allowed these additional *666 deductions for 1973 and 1975. IV. Embezzlement Income
1. Matanky Matters
The broad terms of section 61 defining income suffice to include income derived illegally as well as that lawfully obtained. The Supreme Court in James v. United States,366 U.S. 213 (1961), held that embezzled funds are includable in gross income in the year in which they were embezzled. See also McGee v. Commissioner,61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976); Adams v. Commissioner,456 F.2d 259 (9th Cir. 1972), affg. T.C. Memo. 1970-104; Naegle v. Commissioner,378 F.2d 397 (9th Cir. 1967), affg. T.C. Memo. 1965-212, cert. denied 390 U.S. 927 (1968), rehearing denied 390 U.S. 976 (1968); Nerem v. Commissioner,41 T.C. 338 (1963). We have set forth in great detail in the body of the statement of facts and in the appendices, the various amounts petitioner embezzled from the various Matanky enterprises. Our fact findings are just that. For the most part, the only evidence which conflicts *667 with our findings is the uncorroborated testimony of petitioner. It is not enough to state that this petitioner is not credible. The fact of the matter is that he misrepresented the truth constantly during the course of his testimony and he attempted to have admitted in this Court obviously unauthentic documents as well as altered documents. In his reply brief petitioner continued his course of evasive and misleading testimony. In regard to embezzled funds which went into the 16200 Building account, we have held that the account belonged to petitioner as an individual and he used it in that regard. We have further held that the 16200 Building was owned by petitioners as individuals. Thus, the embezzled amounts that petitioner transferred to his 16200 Building account were amounts over which he had complete dominion and control and those amounts are also includable in petitioners' gross income. Further, we have held that GNI-Cal. [57] was no more than a sham corporation. It had no business purpose whatsoever other than to function as a conduit of funds and possibly to aid petitioner in his embezzlement schemes. Thus, embezzled amounts which were deposited by petitioner into *668 GNI-Cal. accounts also constitute elements of gross income to petitioners. 2. Lundin Matters
We have set forth in the factual statement and appendices at great length the various methods and modes by which petitioner embezzled funds from his cousing Victor Lundin. [58] As was the situation with the Matankys, Mr. Lundin was impressed by petitioner's apparent business knowledge, this time in the field of insurance rather than real estate. He unfortunately allowed petitioner control of the incoming mail as well as control of the bookkeeping functions of the office. [58]
Petitioner contended at trial and in his reply brief herein that Mr. Lundin signed some of the checks in question and that they therefore were not forged. We have found as a fact that petitioner forged Mr. Lundin's signature. In any event, we *669 point out that all of the checks in question, with minor exceptions, [59] were deposited into one or the other of petitioners' bank accounts. Petitioners had full dominion over these funds and full use and enjoyment of them. They represent gross income to petitioners. V. Partnership Income - M & O Enterprises
Respondent determined that petitioners had unreported partnership income in the amount of $ 9,965 in 1974 and $ 47,199 in 1975. A partnership return for 1974 was filed for M & O Enterprises which indicated that petitioners received $ 9,965 in partnership income for that year. It is unclear as to respondent's soource for the 1975 income but we assume it was from M & O. [60] While petitioner placed no direct evidence into the record to refute respondent's determination, it is clear that no amount should have been included in petitioners' gross income for either year from M & O or from Southwest Enterprises. While the partnership agreement provided for an equal distribution between the partners of net profits and net losses, it is clear *670 that there were no net profits. Similarly, we reject petitioner's argument that he is entitled to half the net losses shown on the returns for either 1974 or 1975. The returns filed are not themselves evidence of the truth of the matters included therein and petitioner has failed to produce any evidence as to the losses of M & O or Southwest Enterprises. VI. Unreported Salary Income - Lundin Companies
On their 1976 return petitioners reported no salary income from the various Lundin companies. It is clear petitioner received at least the $ 18,000 determined by respondent. During 1977, petitioners reported the receipt of $ 31,146 from the Lundin companies and this amount is indicated by the W-2 filed by petitioners with their return. We believe that the amount reported by petitioners encompasses the $ 18,000 determined by respondent for 1977 and accordingly hold that respondent's determination of $ 18,000 unreported income for 1977 is incorrect. VII. Additions to Tax fo Fraud
Respondent determined additions to tax for fraud [61] in each of the five years before the Court. To sustain such additions, *671 respondent must prove, by clear and convincing evidence, that petitioner underpaid his taxes for each year and that any such underpayment was due to fraud. Section 7454(a); Rule 142(b). Respondent's burden is met if it is shown that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo. 1966-81. The fraud envisioned in section 6653 (b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F.2d 1272 (7th Cir. 1980). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner,80 T.C. at 1123; *672 Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Rowlee v. Commissioner,80 T.C. at 1123; Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Rowlee v. Commissioner, supra at 1123. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Rowlee v. Commissioner, supra;Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). The Court of Appeals for the Ninth Circuit has recently set forth a nonexclusive list of the "badges of fraud" that circumstantially demonstrate fraudulent intent. These "badges of fraud" include: (1) understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, *673 (5) concealment of assets, and (6) failure to cooperate with tax authorities. Bradford v. Commissioner, supra.The following additional facts support a finding of fraud: (1) engaging in illegal activities, (2) attempting to conceal those activities, (3) dealing in cash, and (4) failing to make estimated tax payments. Bradford v. Commissioner, supra.
Most of these "badges of fraud" and other facts tending to prove fraudulent intent are present in this case. The evidence shows that petitioner substantially understated his income in each of the years before the Court. Further, we consider petitioner's background. He was experienced in real estate transactions as well as insurance. We find it incredible that he could believe that a real estate commission was not includable in his gross income. During 1973 alone petitioner had the benefit of a $ 49,500 commission on the 16200 Building (utilized by him as the down payment), a note for $ 11,700 as a commission on the Almondoz Ranch and one for $ 47,520 on the Kelly Ranch. On the latter note, petitioner removed his name from the note and substituted that of Great Northern Industries thereon, another *674 badge of fraud. Petitioner continues to argue, however, despite strong evidence to the contrary, that he never received physical possession of any of the commissions in question. We have stated directly, in the opinion above, that petitioner was a far from credible witness. We note, in addition, that this Court follows the rules of evidence applicable in nonjury trials in the United States District Court for the District of Columbia (sec. 7453; Rule 143(a)), which provide that a conviction pursuant to a nolo contendere plea may be used to impeach the credibility of a witness. Rule 609(a), Fed. R. Evid.; Masters v. Commissioner,243 F.2d 335, 338 (3d Cir. 1957), affg. 25 T.C. 1093 (1956); Kilpatrick v. Commissioner,227 F.2d 240, 243 (5th Cir. 1955), affg. 22 T.C. 446 (1954); Hicks Co. v. Commissioner,56 T.C. 982, 1027 (1971), affd. 470 F.2d 87 (1st Cir. 1972). Petitioner entered nolo contendere pleas in regard to both the Matanky and the Lundin matters, but we have no need to rely upon such a rule of evidence. It suffices to state that petitioner was *675 noncooperative during the pretrial proceedings, not truthful during the hearing and that he made constant attempts to delay, [62] confuse, and obfuscate the proceedings. We further note, as a relevant badge of fraud, that in each year with the exception of 1973, petitioner had substantial illegal income from his various embezzlements. A basic element of fraud is the existence of an underpayment of tax in each year. Respondent has successfully carried his burden of proof in this regard. He has not only shown that there was some underpayment in this case but has shown very specifically the nature and the amounts of such underpayments. Petitioner asserts that he cannot be held liable for the fraud additions because his books and records were taken in April of 1975 *676 and he was thus unable to prepare the necessary returns. He goes on to argue that for one reason or another he was unable to obtain his records from the Bankruptcy Court (Southwest Enterprises bankruptcy) or from the Los Angeles County Attorney's office (the indictments in the Matanky and Lundin matters). The testimony, however, reveals that his personal papers that were mingled with the Southwest Enterprises records were in fact returned to him, that the Southwest Enterprises records were available to him from the Bankruptcy Court and his papers held in connection with the criminal proceedings were returned to his attorney. We completely reject this contention of petitioner as an excuse for his understatements and his failure to file returns. His period of incarceration, from October of 1978 to the end of 1982, similarly should not have served to prevent him from filing correct returns for the years 1973 through 1977. Accordingly, we find as to petitioner Morton Olken that respondent has sustained his burden of proving fraud for each of the years 1973, 1974, 1975, 1976 and 1977. We reach a different result, however, in regard to petitioner Esther Olken. This petitioner *677 did not appear in Court, instead filing her Declaration that she wished her husband to represent her. [63] There is no question but that she had substantial unreported income in each of the years in question as a result of her residency in California, a community property state. It is also clear that some of the embezzled sums were deposited into her bank accounts. It is unclear, however, whether she endorsed the embezzled checks herself prior to deposit or whether that was done by Morton Olken. It is also unclear whether she knew about the embezzlements at the time she filed or should have filed her Federal income tax returns. Fraud is never imputed or presumed and the courts should not sustain findings of fraud upon circumstances which at most create only suspicion. Green v. Commissioner,66 T.C. 538, 550 (1976); Olinger v. Commissioner,234 F.2d 823, 824 (5th Cir. 1956); Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950). *678 We find that respondent failed in his burden of proving fraud in regard to Esther Olken. VIII. Statute of Limitations
Our holding of fraud serves to settle the contentions of petitioners regarding the statute of limitations. Section 6501(c)(1) provides: In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. Further, there is no bar of the statute of limitations for other reasons. Petitioners' 1973 return was filed on June 10, 1977. Petitioners reported gross income of $ 9,864 and adjusted gross income of $ 7,070. We have found that petitioners omitted from their gross income for that year three commissions totaling $ 108,720. Section 6501(e)(1)(A) provides that where a taxpayer has omitted from gross income an amount which is in excess of 25 percent of the gross income stated on the return, a 6-year statute of limitations applies. Respondent mailed the notice of deficiency herein on December 10, 1982, a date less than 6 years from the filing of petitioners' 1973 return. Petitioner's 1974 "return" in fact was no return at *679 all since it contained no information upon which petitioners' tax could be computed. [64] In the case of failure to file a return, the tax may be assessed at any time. Sec. 6501(c)(3). Further, even if we considered petitioners' document as a return, the 6-year statute of limitations would apply here, too. This "return" was filed on September 19, 1975, and the notice of deficiency was mailed less than 6 years from that date. As to their 1975 year, petitioners do not contend they filed a return. Hence the tax may be assessed at any time. Sec. 7501(c)(3). Petitioners filed their 1976 return on July 18, 1977, and executed their consent to extend the statute to December 31, 1981, on June 6, 1980, well within the general 3-year period. Sec. 6501. Further, the statutory period was again extended on April 3, 1981, to December 31, 1982. The notice of deficiency was mailed prior to the latter date. Petitioners' 1977 return was filed on June 12, 1978, and was extended by consent on April 3, 1981 (a time within the 3-year statutory period) to December 31, 1982. The notice of deficiency *680 was issued prior to that date. Petitioners' contentions regarding the statute of limitations are meritless. IX. Claimed Carryback
Petitioners were allowed to amend their petition to claim a carryback of the purported loss incurred in 1979 relating to settlement of the Matanky lawsuit for a constructive trust regarding their residential property. [65] Although the record is not complete in this regard, apparently petitioners granted title to their residence in settlement of the civil action by the Matankys arising out of petitioner's embezzlements. Petitioner now seeks to offset his 1979 settlement against embezzlement income in 1974 and 1975. Petitioners are not entitled to such a carryback of their costs of restitution. We considered a similar case in Yerkie v. Commissioner,67 T.C. 388 (1976), *681 where the taxpayer embezzled funds from his employer during the year 1966 through 1970, and then repaid some amounts during 1971 and 1972. When amounts embezzled are repaid, a deduction for individuals is permitted by section 165(c)(2) as a loss in a transaction entered into for profit, though not connected with a trade or business. Taxpayers in Yerkie claimed that section 1341 applied to allow the deduction for years earlier than the years of repayment. Section 1341 allows such a deduction where income is "included under a claim of right." We held in Yerkie that the taxpayer did not hold the embezzled funds under a claim of right and hence section 1341 was not applicable. We then went on to reject the taxpayer's alternative argument that the repayment of embezzled funds constitutes a trade or business expense which serves to create a net operating loss in the year of repayment subject to the carryback provisions of section 172. Our holding in Yerkie is equally applicable to the situation at bar. While petitioner may have perfected embezzlement to a fine art, we cannot hold that he was in the trade or business of embezzling. We held to like effect in Mannette v. Commissioner,69 T.C. 990 (1978), *682 where we went on to state that the taxpayer's right to substantive due process under the Fifth Amendment was not violated by taxing income on an annual rather than transactional basis. See also McKinney v. United States,574 F.2d 1240 (5th Cir. 1978), cert. denied 439 U.S. 1972 (1979). Petitioners are not entitled to a carryback. X. Innocent Spouse
Esther Olken claimed the benefit of section 6013(e), the so-called innocent spouse provision. That section provides as follows: (e) Spouse Relieved of Liability in Certain Cases. -- (1) In general. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial *683 understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
Without going into an unnecessary, prolonged discussion of the provisions of this section, it suffices to say that no evidence has been presented which would go to show that Esther Olken did not know or had no reason to know of the substantial understatements. She has simply failed to meet her burden of showing that she has met the requirements of the section. Lessinger v. Commissioner,85 T.C. 824, 838 (1985). XI. Addition to Tax - Section 6654
Petitioners failed to file tax returns for 1975 and further made no payments either as estimated tax or withholding tax credits on tax due for that year. Section 6654(a) imposes an addition to tax "in the case of any underpayment of estimated tax by an individual." Respondent's determinations were correct and they are upheld. XII. Miscellaneous Matters
We note two final matters. At the conclusion of trial herein, the Court directed that simultaneous briefs be filed by *684 the parties, together with simultaneous reply briefs. This was a direction by the Court that the parties marshal what they considered to be the relevant facts and legal arguments and present them to the Court for its assistance in resolving the issues presented. Pursuant to this direction, petitioner had an obligation to assist the Court by organizing the material presented at trial. Cf. Stringer v. Commissioner,84 T.C. 693 (1985), affd. by order 789 F.2d 917 (4th Cir. 1986); Primoff v. Commissioner,T.C. Memo. 1985-562. Although respondent filed a brief in accordance with the Court's instruction, petitioners filed none. Under the circumstances, we would be justified in deciding this case in favor of respondent on the basis that petitioners' failure to file a brief constituted a concession of the issues presented. See Calcutt v. Commissioner,84 T.C. 716, 721-722 (1985); Bender v. Commissioner,T.C. Memo. 1985-375; Stonegate of Blacksburg, Inc. v. Commissioner,T.C. Memo. 1974-213; Hough v. Commissioner,T.C. Memo. 1986-229. We forebear to do so because of the fact *685 that petitioner was a layperson and because of his statements that he was indigent and could not afford a copy of the transcript. We do note, however, that much of this case was stipulated and that petitioner had available the Stipulations of Fact, together with the attached 690 exhibits, as well as copies of each of respondent's and petitioners' exhibits. Nevertheless, petitioner chose not to help ease the burden on the Court of assembling this mass of material. Petitioner has also complained that his right to a fair trial has been violated as a result of an order of this Court dated March 29, 1985, that he serve no further subpoenae on any third party witness without prior leave of this Court. (The Court's order was in response to a subpoena duces tecum petitioner caused to be served which was quashed on the grounds, inter alia, that it was oppressive and burdensome.) Petitioner subsequently on June 3, 1985, filed a motion for leave to serve a subpoena to Seymour Matanky to appear as a witness for trial. Petitioner failed to enclose a copy of his proposed subpoena, was so advised by the Court on June 13, 1985, and upon receipt of petitioner's form subpoena, granted leave to *686 serve on July 5, 1985. The trial itself in this matter commenced on July 22, 1985, and continued through August 1, 1985. Seymour Matanky did not appear as a witness and we can assume that petitioner failed to effect service upon him. We completely reject petitioner's allegations that delay by this Court hampered his ability to serve Dr. Matanky. Petitioner's problems are of his own making and the Court granted him leave to serve within a reasonable time of receipt of his form of subpoena and well prior to the commencement of the trial. As the bulk of his contentions herein, petitioner's contention that he did not have a fair trial is simply frivolous. In order to give effect to the stipulations of fact and to the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. In addition to the unreported income, respondent's deficiency notices make provisions for certain minor adjustments such as adjustments to the allowable standard deduction and carryover of short-term capital loss. ↩
3. This recharacterization, however, has no effect on the amount of tax in issue. ↩
4. During the trial petitioners were permitted to amend their petition to raise this issue. ↩
5. The "return" filed for taxable year 1974 contained no information regarding petitioners' income and deductions for that year. On the line labeled "Balance Due IRS" petitioners placed the following statement: "Tentative to be filed at a later date." No returns were filed for the 1974 tax year, and this document does not constitute a return. ↩
6. Respondent placed into evidence Certifications of Lack of Records regarding both petitioners for the 1975 taxable year. ↩
7. There were two Consents to Extend the Time to Assess Tax covering the 1976 taxable year. ↩
8. Esther Olken failed to appear during the course of this trial. She did, however, file with the Court her Declaration that she authorized Morton Z. Olken, her husband, to act in her behalf at the trial. ↩
9. Petitioners stated that their failure to file their briefs was a result of their inability to afford a copy of the trial transcript. Although in the past we have dismissed cases because a party failed to file briefs, we have been exceedingly tolerant of petitioners' failure to file because they are self-represented and because of their alleged economic condition. ↩
10. On July 15, 1985, the parties filed a first stipulation of facts. A second stipulation was filed on July 18, 1985. Finally, on July 22, 1985, additional facts and exhibits were orally stipulated. ↩
11. The record contains an official statement of the Office of the Secretary of State of Illinois indicating that "an examination of the records of this office does not disclose the existence of a corporation in the name, Great Northern Industries, Inc., an Illinois corporation, for the year 1973." ↩
12. Pending the closing of the sale, petitioner pointed out to the Matankys several problems with their building manager, and helped them operate the building until the sale. ↩
13. Petitioner kept an original copy of the promissory note in a file he maintained at his office in the 16200 Building. ↩
14. This ranch was also known as Lancaster Ranches, Inc. ↩
15. etitioner on November 15, 1973, formed a California corporation named Great Northern Industries. The record is unclear as to whether this note was payable to the so-called Illinois corporation or to the California corporation. It is also far from clear that the note, as originally executed, in fact was payable to Great Northern Industries. It is clear that the words "Great Northern Industries, Inc." were typed on a different typewriter than that used on the balance of the note. A discussion of GNI-Cal. can be found in part IV, infra.↩
16. Petitioner's own Exhibit 715, page 5, indicates that the note was originally made payable to Morton Z. Olken. ↩
17. Petitioner kept an original copy of this note in a file in his office at the 16200 Building. ↩
18. Ms. Schoonover also performed similar duties for other business entities which were operated by petitioner. Petitioner maintained a suite in the 16200 Building, which he owned. In that suite he managed the operation of that building, Southwest Enterprises, Encino Medical Towers and other businesses. Ms. Schoonover assisted petitioner in all of his business activities. ↩
19. Ms. Schoonover did not have signatory authority over any of the bank accounts. Her duties with respect to these accounts were to deposit funds at the direction of petitioner and to prepare (type) checks for petitioner's signature. These duties were performed under the specific instruction and guidance of petitioner. ↩
20. See Appendix A for a detailed listing of these checks and facts relevant thereto. All of the appendices to this opinion are incorporated as part of the Findings of Fact. ↩
21. Petitioner claims that this series of checks was either reimbursements of expenses paid by GNI-Cal. on behalf of Southwest Enterprises or payments to establish an escrow for another partnership (M & O Enterprises) to purchase the Encino Medical Towers. The record does indicate that GNI-Cal. did make some payments on behalf of Southwest Enterprises but it also indicates that GNI-Cal. was repaid by Southwest Enterprises' checks other↩ than those listed above. 22. Petitioner contends that this was a cost for one of the animals on one of the ranch properties. It was not; it was a personal expense of petitioner. ↩
23. Petitioner stipulated that all checks payable to the Ashley Company were made in payment for construction of his personal residence. Petitioner hired Michael Ashley, owner of Ashley Construction Company to construct his personal residence at 23924 Lewis & Clark Road in Hidden Hills, California. Petitioner also hired Mrs. Ashley as an interior decorator to decorate his home. Mr. Ashley insisted that petitioner make the checks payable to Ashley Construction Company and not Ashley Company. Petitioner told Mr. Ashley that he would write the checks as he saw fit, and if Mr. Ashley's bank honored them, he should not be concerned. Petitioner directed Ms. Schoonover to record all checks payable to Ashley Construction as payments for crop dusting on the ranches owned by Southwest Enterprises. ↩
24. One of the checks was used to purchase a cashier's check from the Bank of America payable to Mark Hayworth for irrigation work. ↩
25. A check for $ 20 was for waxing and polishing petitioner's personal automobile; $ 750 for a loan to petitioner's cousin and $ 117.28 to pay airfare for the cousin for a trip which was not connected with Southwest Enterprises. Petitioner instructed the bookkeeper to enter the loan in the ledger as "irrigation ditch." Two checks totaling $ 3,200 were written to the bookkeeper who cashed them and returned the funds to petitioner, who then invested $ 2,200 with friends in some sort of commodities investment. ↩
26. Petitioner had advanced through a Great Northern Industries account in January and February of 1974 various costs on behalf of Southwest Enterprises, in the total amount of $ 5,205.22. These amounts were repaid to petitioner in April of 1974. None of the amounts we have held to be embezzled by petitioner pertain to this group of expenditures. Petitioner's generalized claims that the embezzled amounts were repayments due him are simply untrue. Petitioner also made generalized claims throughout the trial that these checks represented "exchange checks," presumably to float funds between banks although he never directly defined the terms. In any event, the record is devoid of any evidence to support such a claim. ↩
27. See Appendix B for a detailed listing of these checks and facts relevant thereto. ↩
28. MOF was the informal predecessor to Southwest Enterprises. ↩
29. On April 18, 1974, and June 20, 1974, checks were issued for $ 9,000 and $ 9,265, respectively. The additional $ 765 was interest due on the note. ↩
30. See parts I. B and I. C of the Findings of Fact, supra,↩ for details surrounding the acquisition of the Encino Medical Towers and a detailed statement of the principles governing the partners' relationship. 31. See Appendix C for a detailed listing of these checks. ↩
32. See Appendix D for a detailed listing of rental payments diverted petitioner's 16200 Building account. ↩
33. On March 9, 1979, the LADA's office released petitioner's records to his attorney at the time, Theodore Tabah. ↩
34. See n. 11, supra.↩
35. Petitioner provided copies of purported minutes of GNI-Cal. mainly regarding bank account openings. The investigator for LADA, however, testified that he located no minutes when records were seized pursuant to a search warrant. ↩
36. It appears that any and all funds received by GNI-Cal. were passed directly through to petitioner for his personal use and enjoyment. ↩
37. The record is unclear as to why there was this second Grant Deed to GNI-Cal. ↩
38. This conclusion is supported by numerous other facts. Throughout 1974 and 1975 there were numerous employees working at the 16200 Building. Each of these employees was issued W-2 Forms with M. Olken 16200 Ventura Building listed as the employer and not GNI-Cal. Petitioners, on various financial statements listed themselves and not GNI-Cal. as the owners of the building. During 1974 and 1975, petitioner filed Quarterly Federal Tax Returns as an individual operating under the trade name 16200 Ventura Building. No mention of GNI-Cal. was made on these returns. When delinquent property tax notices were issued regarding the 16200 Building, they were issued to petitioners as individuals and no mention of GNI-Cal. was made. Finally, on May 15, 1975, petitioner filed a fictitious business memo statement which stated that he was doing business as "16200 Ventura Building." He did not fill in the sections relating to a corporate registrant. ↩
39. Petitioners did not report income from the building nor did they claim expenses connected with its operation for either 1974 or 1975.↩
40. This figure also contains an allocation of property taxes.↩
41. Dr. Matanky was also actively involved in the negotiations. His interest in this transaction was a result of his filing a civil suit against petitioner in which he requested that a constructive trust of petitioner's assets, including the 16200 Building, be established in his favor. In connection with that suit a Lis Pendens covering the 16200 Building was also filed. ↩
42. The parties stipulated that the purchase price was $ 1,214,007 after reduction for petitioner's $ 49,500 commission fee. It is our holding, since we have included the commission in petitioner's gross income, that his cost basis in the building was $ 1,263,507. During the time he held it, depreciation accumulated in the amount of $ 43,503. ↩
43. Petitioner told the partners of Rock that the 16200 Building was about 95 percent occupied when in fact numerous tenants were in the process of moving out of the building. He represented to Rock that the property taxes, which were in arrears, were paid and up to date. He told Rock that a second deed of trust on the 16200 Building was assumable, when in fact, it was not. Petitioner also told Rock that there were 24 parking stalls that were allocated to the 16200 Building at the Encino Medical Towers building, and this was not the case. After the escrow closed Rock discovered numerous other misrepresentations that were made by petitioner regarding the 16200 Building. Petitioner had overstated by 7 to 10 percent the leasable square footage of the 16200 Building. He overstated the number of leases that were supposed to be in effect at the time of sale. He indicated that a certain amount of remodelling had been done, however the remodeling had either not been done or was not done in conformity with the building code. ↩
44. In 1976, the business was incorporated and operated under the same name until 1977 when its name was changed to United Western Insurance Marketing, Inc. (hereinafter "UWIM"). ↩
45. During 1977, a related company was formed under the name Great Northern Administrators (hereinafter "GNA"). GNA operated as a corporation specifically set up to administer all claims filed by persons covered by self-insurance programs established by VLA and UWIM. ↩
46. Petitioner had joint signatory authority, along with Lundin and a bookkeeper, over all of VLA, UWIM, & GNA checking accounts. Each check required two signatures. ↩
47. See Appendix E for a listing of these checks. ↩
48. ↩
Checks issued in 1976:
Marjorie Sherman (petitioner's sister)
$   164.18
Boulevard Mercedes (petitioner's auto lease)
321.50
H. Alvord (real property tax)
1,139.73
Internal Revenue Service
100.00
$ 1,725.41
Checks issued in 1977:
Marjorie Sherman (petitioner's sister)
$ 178.75
Tiffany Club
40.00
Internal Revenue Service
150.00
$ 368.75
49. See Appendix F for a listing of these checks and facts relevant thereto. ↩
50. Respondent increased the deficiency for 1973 by asserting that petitioner had an additional $ 11,700 in commission income. ↩
51. The details of respondent's burden in this regard will be discussed more fully infra.↩
52. Petitioner argues that Great Northern Industries, Inc., a California corporation, purchased the 16200 Building. Respondent argues that GNI-Cal. should not be recognized for tax purposes and that though GNI-Cal. at one time held title to the 16200 Building during 1973, the substance of the transaction was that petitioner in his individual capacity purchased the 16200 Building from the Matankys. In fact, title was originally taken in the name of GNI-Ill., a nonexistent corporation. We hold that petitioners were the beneficial owners of the 16200 Building. ↩
52a. In Williams v. Commissioner,64 T.C. 1085 (1975), we agreed with the views expressed by the Court of Appeals in Commissioner v. Daehler,281 F.2d 823 (5th Cir. 1960), revg. 31 T.C. 722↩ (1959).
53. Thus, on September 26, 1973, petitioner had the Matankys transfer title to the 16200 Building to GNI-Ill. On December 19, 1973, as president of the alleged Illinois corporation, Great Northern Industries, petitioner deeded the 16200 Building back to the Matankys. Also, on October 24, 1973, petitioners, as officers of the alleged GNI-Ill., deeded, by quitclaim deed, the 16200 Building to "Morton Olken and Esther Olken as husband and wife." This latter deed was not notarized until December 9, 1974, and was not recorded until December 23, 1974. ↩
54. The commission with respect to this ranch was not included in respondent's notice of deficiency, but was raised in respondent's second amendment↩ to his answer. As a new matter the burden of proof in this regard is on respondent, Rule 142(a), and respondent has carried his burden. 55. We are nevertheless convinced that petitioner changed the escrow instructions by handwriting in the words "Great Northern Industries" and that he also either changed the name of the payee on the promissory note to Great Northern Industries or instructed the escrow company to do so. ↩
56. GNI-Cal. was suspended on February 3, 1975, restored on April 11, 1975, and then further suspended on December 1, 1976. Apparently, yet another Great Northern Industries was formed by petitioner on June 15, 1979, as a California corporation and was in good standing as of February 3, 1981. ↩
57. GNI-Ill., of course, was not in existence at all during 1973 and the record does not indicate in any respect that it ever was in existence. ↩
58. Petitioner concedes that he received income from the Lundin companies for 1976 and 1977 in the amounts of $ 3,829.60 and $ 62,087.75, respectively. We have found that the amount in 1977 was greater, $ 68,899.09. ↩
59. A few checks were written to third parties, such as the Internal Revenue Service, for personal purposes of petitioners. ↩
60. On brief, respondent mentioned only the 1974 income. ↩
61. Respondent did not request as an alternative the addition to tax for negligence under the provisions of section 6653(a). ↩
62. One Judge presided during the pretrial proceedings herein and a Special Trial Judge heard the case. The process of arriving at the stipulations required by our Rule 91 took some 540 transcript pages before Judges of this Court and some 17 hours of hearings. Most of this extraordinary amount of time was caused by petitioner's refusals to stipulate to items about which there was little, if any, question. ↩
63. We note that the signature "Esther Olken" on the Declaration and on the Petition filed herein is completely different from the signature on petitioners' brief and from that on many checks deposited into Esther Olken's bank accounts. ↩
64. See, e.g., Commissioner v. Lane-Wells Co.,321 U.S. 219↩ (1944). 65. Petitioner now claims, falsely, that petitioners were also allowed to amend their petition to claim as an offset the default judgment secured against them in 1981 in connection with petitioner's misrepresentations on his sale of the 16200 Building to The Rock. Their amended petition does not include this claim nor were they granted leave to file an amendment encompassing this claim. ↩